551 A.2d 347

The Colonial Manor Personal Care Boarding Home, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Argued October 4, 1988, before Judges DOYLE, COLINS and PALLADINO, sitting as a panel of three.

*Carl P. Izzo, Jr.,* with him, *Robert L. Webster, Webster & Webster,* for petitioner.

*Howard Ulan,* Assistant Counsel, for respondent.

OPINION BY JUDGE DOYLE, December 7, 1988:

Before us are consolidated appeals both taken by Colonial Manor Personal Care Boarding Home (CM) from orders of the Department of Public Welfare (Department). The first order entered by the Office of Hearings and Appeals (OHA) adopted a hearing examiner's recommendation and dismissed CM's appeal of the revocation of its personal care home license.[1] The second order was entered by the Secretary of the Department and denied CM's request for reconsideration.[2]

The hearing examiner found that Frank A. Bock, Sr. owned and was the licensee of both the Brownsville Golden Age Nursing Home (BGA) and CM and that the two establishments were located across the street from each other. In the last quarter of 1985 thirty-six BGA patients were receiving intermediate level nursing care reimbursement under the Medical Assistance Program. The patients at BGA averaged eighty years of age and had resided at BGA for an average of three years. The need for intermediate nursing care had been certified regularly by BGA's staff throughout each patient's stay.

---

[1] The appeal of that order to this Court is at Docket No. 402 C.D. 1988.

[2] The appeal of that order to this Court is at Docket No. 778 C.D. 1988.

On October 1, 1985 medical assistance reimbursement was terminated at BGA; however, BGA was not made aware of this termination until December 1985. Bock sued in federal court to have his medical reimbursement reinstated but on February 7, 1986 the federal district court denied him preliminary relief. Because of the reimbursement suspension Bock was required to expend approximately fifty-five thousand dollars per month from his own funds to care for the patients. Thus, in February 1986, he decided to discharge all of his medical patients from BGA. On February 24, 1986 the medical director of BGA, Dr. Naresh Bhatt, after conducting a medical assessment of each patient, signed physician's certificates for twenty-four of the thirty-six BGA patients indicating that they did not require intermediate nursing care but could live instead in a personal care boarding home. Beginning the following day twenty-four of the patients were transferred to CM.[3] The families of the patients were contacted prior to the transfer and given an opportunity to arrange for placement of their choice. Those patients admitted to CM and/or their families consented to be moved. The hearing examiner also specifically found:

11.   Of the 24 transferred patients, . . . :
(a)   13 required wheelchairs.
(b)   6 could not move the chairs themselves.
(c)   11 required physical restraint.
(d)   14 were confused.
(e)   12 required total assistance in bathing, dressing, and getting out of bed.
(f)   12 were incontinent.
(g)   9 needed therapeutic diet.
(h)   1 was on renal dialysis twice a week.
(i)   3 required the availability of oxygen.

---

[3] One was later transferred back to BGA.

(j)   4 patients with behavior problems required the availability of injectable medication.

(k)   5 patients needed daily blood pressure and/ or pulse checks.

(l)   3 patients needed to have hydration levels monitored.

Personal care homes ordinarily have no nursing staff at all. *See* 55 Pa. Code §2620.32 (providing for provider and staff qualifications for personal care homes and omitting any mention of the requirement of nursing staff).

The hearing examiner found that immediately after the transfer to CM a number of the patients were without identification bands, that many were confused and could not identify themselves, that the medical records had not been transferred along with the patients, and that the circumstances constituted an emergency situation. He further found that in early March a team headed by Dr. Hertzler (a physician consultant for the Department) and including three nurses, determined that at least seventeen of the twenty-three patients required a level of care higher than personal care. Further, as of March 19, 1986, two nurses who were licensed nursing home administrators observed that ten patients who required intermediate nursing care were still at CM. Ultimately, these patients were transferred from CM pursuant to a relocation plan dated March 10, 1986. The Department determined that the conduct described above constituted sufficient grounds for revocation of CM's personal care home license and notified CM of this. CM appealed and the hearing examiner, based upon the above-stated findings, recommended that CM's appeal be denied. OHA adopted this recommendation in an order dated and mailed January 15, 1988. CM timely appealed to this Court at 402 C.D. 1988 and also appealed to the Secretary of the Depart-

ment. The Secretary denied the appeal on March 4, 1988 and CM timely appealed to this Court from that order at 778 C.D. 1988.

Before considering the initial appeal at 402 C.D. 1988, we shall examine the appeal at 778 C.D. 1988. Unfortunately, we must conclude that there was no valid order which could be appealed. OHA entered its order on January 15, 1988. CM then petitioned the Secretary for reconsideration. Pursuant to Section 241(a) of the General Rules of Administrative Practice and Procedure, 1 Pa. C. S. §35.241(a), the party seeking reconsideration has fifteen days from the date of the order appealed from in which to file its petition unless a statute provides otherwise. No statute alters this regulation in this case. And, the Secretary has thirty days from the date on which the petition is filed to respond *unless a lesser time is provided for by law.* 1 Pa. C. S. §35.241(d). Pa. R.A.P. 1701(b)(3) makes just such a provision when it dictates that the Secretary may grant reconsideration only within the time prescribed by the Rules of Appellate Procedure for filing a petition for review, *i.e.*, thirty days from entry of the order. *See* Pa. R.A.P. 1512(a).

Applying these rules to the facts herein we see that the OHA order was dated and mailed January 15, 1988. It is the mailing date which triggers the beginning of the appeal period. *See Sheets v. Department of Public Welfare,* 84 Pa. Commonwealth Ct. 388, 479 A.2d 80 (1984). Thus, CM would have had until February 1 (the fifteenth and sixteenth days occurred on a weekend and are excluded from the time calculation, *see* Section 1908 of the Statutory Construction Act of 1972, 1 Pa. C. S. §1908) to petition for reconsideration. CM's petition for reconsideration, however, was postmarked February 1 and was not received by the Department until February 3 as is indicated by the Department's date stamp. It

is the day upon which the Department receives the petition which is controlling for purposes of the time computation here. *See* 1 Pa. Code §31.11; *Skyvue Terrace, Inc. v. Department of Public Welfare,* 85 Pa. Commonwealth Ct. 123, 482 A.2d 58 (1984). Even if, however, the petition for reconsideration were timely filed with the Secretary, we still would conclude that no valid order of the Secretary exists. This is because the Secretary had thirty days *from the date of the OHA order* (*i.e.,* January 15, 1988) to act upon the petition. He did not deny it, however, until March 4, 1988. But, after the thirty days had elapsed he lost the authority to enter *any* order. *Pine Haven Residential Care Home v. Department of Public Welfare,* 99 Pa. Commonwealth Ct. 1, 512 A.2d 59 (1986); *Monsour Medical Center v. Department of Public Welfare,* 111 Pa. Commonwealth Ct. 359, 533 A.2d 1114 (1987); *Brookline Manor Convalescent Rest Home v. Department of Public Welfare,* 89 Pa. Commonwealth Ct. 630, 492 A.2d 1207 (1985). Thus, his order was a nullity and there was nothing to appeal. Accordingly, we must dismiss the appeal docketed at No. 778 C.D. 1988. *See Pine Haven; Monsour Medical; Brookline.*[4]

Having disposed of that procedural problem we now turn to the case docketed at No. 402 C.D. 1988. That appeal is properly before us and we shall decide it on the merits keeping in mind that our scope of review where both parties presented evidence is limited to determining whether there has been a constitutional violation or an error of law and whether the necessary findings of fact are supported by substantial evidence. Sec-

---

[4] We note that no briefing schedule had ever been established for No. 778 C.D. 1988 and no briefs were filed dealing with the Secretary's order. Because of our disposition of this appeal, however, we need not be concerned about that matter.

tion 704 of the Administrative Agency Law, 2 Pa. C. S. §704; *Kirkwood v. Unemployment Compensation Board of Review*, 106 Pa. Commonwealth Ct. 92, 525 A.2d 841 (1987).

CM has alleged twenty-two separate grounds for appeal. We believe that many of its arguments can be combined for purposes of our discussion and we shall, accordingly, do so.

First, CM contends that the hearing examiner erred in concluding that an emergency and a health care crisis existed at its facility subsequent to the transfer and that his conclusion to this effect was not based upon substantial evidence. Department Regulation 20.37, 55 Pa. Code §20.37, provides in pertinent part:

**Emergency removal of residents.**

If the Department finds evidence of gross incompetence, negligence, misconduct in operating the facility or agency, or mistreatment or abuse of clients, likely to constitute an immediate and serious danger to the life or health of the clients, the Department will take immediate action to remove the clients from the facility or agency.

The testimony of Patricia Buchanan, R.N., B.S.N., a Department of Health employee, was as follows:

At this point [March 1, 1986] I did tour the entire facility with the home health nurse and we did talk with some of the patients and she explained some of the things she was doing with the patients.

During this tour it was evident that there were a number of patients that did not have identification bands on.

Many of these patients were confused and could not identify themselves.

We questioned personal care aides that were present as to the identity of some of the patients and they also did not know who they were.

They said due to the large influx of patients at one time they didn't have time to learn the patient's [sic] names.

During our tour there was one patient that the home health care nurse had just completed the dressing change on, and this patient had open bed sores on the fecal area and the heels.

She also had a urinary catheter, she had an air mattress on the bed.

She was confused and required total care.

She was in a two-bed room.

There was another gentleman on the second floor who was in a wheelchair.

There were no staff present on that floor at the time that we were up there.

And there was no mechanism for him to call for assistance if he needed help.

There was another gentleman on the ground level, who, as we entered the room, he was in bed.

He had one leg thrown over the side rail.

He was a diabetic, insulin-dependent, which the record in the nursing home verified as well as the information the home health nurse had.

I questioned whether the man was ambulatory and the personal care aide indicated that he could ambulate with assistance.

She asked the home health nurse to help her ambulate the man from the room to the lounge.

So they proceeded to get the gentleman out of the bed and they each were holding him under the arms.

The man was not able to take any steps.

They literally were dragging him down the hallway with his feet dragging along the floor.

The personal care aide kept saying, look how well he's ambulating.

During—

Q. [by the Department's attorney] The medical records that existed over at the nursing home, were they transferred across the street?

A. No they were not.

We also were in the team that convened on Monday, the third of March.

And also during the course of the entire visit we had reviewed records in the nursing home as well as observed patients that were actually transferred to the boarding home.

We also were told to observe medication administration system, which was literally non-existent.

We interviewed a housekeeper that said she was responsible for medication administration.

We questioned her as to how she could identify patients if they didn't have identification bands on.

And she stated that there was usually a personal care aide was available that had worked in the nursing home and knew them.

But she indicated that this was a problem at times since so many patients were transferred at one time.

N.T. 44-46. This evidence is such that a reasonable person might conclude an emergency situation and health care crisis existed and is thus substantial evidence as a matter of law. *See Murphy v. Department of Public Welfare*, 85 Pa. Commonwealth Ct. 23, 480 A.2d 382 (1984). We, therefore, do not perceive any error on the part of the hearing examiner in reaching the conclusion he did.

CM argues that if, in fact, an emergency did exist the Department, pursuant to Regulation 20.37, was required to remove the patients *immediately*. Admittedly, the relocation took some time, but we, nonetheless, think that CM's argument is spherically senseless, *i.e.* illogical from any perspective. First, while the situation may have been a crisis, the patients would have been no better off being removed from that facility until a better place for them was located and the necessary paper work accomplished. Second, another quick relocation would not necessarily be in the best interest of patients who are already confused. Third, "immediate" can mean not only "at once" but also within "a reasonable time in view of the particular facts and circumstances of [the] case under consideration." *Black's Law Dictionary*, 675 (5th ed. 1979). We see nothing on this record to indicate that the Department did not act immediately under the circumstances present. We, thus, reject CM's argument to this effect.

CM further maintains that Regulation 20.37 may be invoked only when there is evidence of, *inter alia*, gross negligence. We believe that the testimony of Ms. Buchanan would support such a determination and, hence, reject CM's argument that no evidence of gross negligence existed.

Next, CM alleges error of law in that the hearing examiner concluded that Dr. Bhatt's certifications were invalid; it also maintains that this conclusion is not supported by substantial evidence. CM maintains that because there was no evidence of collusion between Dr. Bhatt and Bock, the determination that the certificates were invalid is erroneous. First, we agree with the Department that Dr. Bhatt's motives or "honesty" in signing the certificates is legally irrelevant to these proceedings as it is not his license which has been revoked. Second, we disagree with CM that the Department had

to prove collusion in order to show that the medical certificates were invalid. There is evidence in the form of testimony of various health care professionals that these patients needed skilled nursing care. Further, the evidence reveals that the patients in question had previously and repeatedly been certified as needing skilled intermediate nursing care and that Dr. Bhatt certified all of them in a very brief period of time as no longer needing that level of care. Significantly, there was no evidence that any patient's condition had improved between the certification that skilled care was needed and Dr. Bhatt's certification that it was not. We, thus, hold that the hearing examiner's conclusion that the certificates were invalid was supported by substantial evidence and not in error.

CM next asserts that the hearing examiner erred in concluding that Bock knew the certifications were invalid and, thus, that he could not rely upon them. The hearing examiner determined that Bock was of average or higher intelligence, that he had been in the nursing home profession since 1966, and that he had some knowledge of the medical care needed by a geriatric population. Therefore, he determined that Bock knew that two-thirds of the population of nursing home patients averaging eighty years of age with three continuous years as nursing home residents who were recently certified as needing intermediate nursing care do not, within the span of a few weeks, get well enough to live without skilled nursing care.[5] The statistics referred to in this finding (two-thirds of the population, average

---

[5] CM asserts that the Department never proved that these twenty-four people could *not* have undergone such a dramatic change. This is specious; CM never demonstrated any improvement in any patient; hence, the Department needed to prove nothing and, in any event, we refuse to impose upon it an obligation to prove a negative.

age eighty, average stay three years) are undisputed. As a reviewing court we must afford the party that prevailed below the benefit of all inferences that can be logically and reasonably drawn from the evidence. *Taylor v. Unemployment Compensation Board of Review*, 474 Pa. 351, 378 A.2d 829 (1977). Where, as here, Bock sought the transfer from one of his facilities which had lost its reimbursement status to another which had not and where the evidence disclosed that fully two-thirds of the population of BGA were suddenly certified as not needing skilled care, we perceive no error in the hearing examiner's findings and conclusion that Bock knew the certificates were invalid. And, having resolved this issue in this manner, we need not belabor whether Bock was entitled to rely upon the physician's certificates as it is clear that one with knowledge that statements of another are false cannot avail himself of a reliance defense. *See Action Industries, Inc. v. Pennsylvania Human Relations Commission*, 102 Pa. Commonwealth Ct. 382, 518 A.2d 610 (1986) (employer's *good faith* reliance on doctor's medical opinion as to job-related handicap is sufficient to negate intent to discriminate).

As its next point of error, CM contends that the hearing examiner erred in concluding that the facility had committed actions for which Section 1026(b) of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. §1026(b), authorizes license revocation. Section 1026(b) pertinently provides:

> The department shall refuse to issue a license or shall revoke a license for any of the following reasons:
>
> . . . .
>
> (4) Gross incompetence, negligence or misconduct in operating the facility;

(5) Mistreating or abusing individuals cared for by the facility.

In *Pine Haven* the Department revoked the license of a personal care home because it found various deficiencies including bathroom tiles needing to be replaced, menus not posted, insufficient closet space, and inadequate record keeping with respect to the dispensing of medication. This Court upheld the revocation indicating that *"[a]ny one* of the above violations would be sufficient grounds for refusal to issue a license." *Id.* at 5, 512 A.2d at 61 (emphasis added).

In the instant case, the testimony of Ms. Buchanan as to the conditions she witnessed subsequent to the transfer are far more serious than failure to post menus or inadequate closet space; accordingly, we hold that at a minimum the Department established gross negligence and, thus, has shown a statutory basis for its revocation action. Because we conclude that a valid basis for the revocation existed under Section 1026(b)(4) of the Public Welfare Code, we need not also decide whether the Department established an independent basis for revocation under Section 1026(b)(5).

CM also takes issue with the hearing examiner's findings and conclusions that Bock lacked the personal integrity and good character which Department Regulation 2620.31(a)(6) indicates is a qualification for providers. We believe that the foregoing discussion pertaining to Bock's knowledge that the physician certificates were invalid adequately disposes of this issue as well, and hence, we summarily reject CM's contention.

Finally, CM argues that the hearing examiner abused his discretion in failing to determine that the Department, in relocating the patients immediately after their transfer to CM, had elected as its remedy the option under Section 1026(a) of the Public Welfare Code and, thus, was precluded from also terminating CM's

license under Section 1026(b). The Department, however, correctly points out that its relocation of the patients was not conducted pursuant to Section 1026(a) of the Public Welfare Code (which permits the Department, subsequent to an inspection where violations of the Public Welfare Code or the Department's regulations are found, to require a facility to take corrective action) but was conducted under Regulation 20.37. Moreover, when the Department employees went to the facility immediately after the transfer it was not for purposes of an inspection under Section 1026(a), but for purposes of coordinating the emergency removal of patients under Regulation 20.37. The doctrine of election of remedies applies only when available remedies are inconsistent; *i.e.* the remedies constitute different means of adjudicating the same issues. *West Middlesex Area School District v. Pennsylvania Labor Relations Board*, 55 Pa. Commonwealth Ct. 404, 423 A.2d 781 (1980). As the Department succinctly states in its brief, "[s]urely there is nothing inconsistent in removing patients from the emergency circumstances which [CM] created, and then revoking [CM's] license for having created the emergency." Department's brief p. 19. We agree and thus conclude that the doctrine of election of remedies is not applicable here.

Having determined that the hearing examiner's findings are supported by substantial evidence and having perceived no error of law, we affirm the OHA order which adopted the hearing examiner's recommendation.

## ORDER

Now, December 7, 1988, the order of the OHA in the above-captioned matter is hereby affirmed. It is further ordered that the petition for review from the order of the Secretary docketed at No. 778 C.D. 1988 is hereby dismissed.