**Elaine WINSTON, Petitioner,**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 12, 1996.

Decided April 22, 1996.

---

Kathleen A. Segmiller, for Petitioner.

Jeffrey P. Schmoyer, Assistant Counsel, for Respondent.

Before DOYLE and FRIEDMAN, JJ., and NARICK, Senior Judge.

FRIEDMAN, Judge.

Elaine Winston (Winston) appeals from an order of the Director of the Pennsylvania Department of Public Welfare (DPW), Office of Hearings and Appeals (OHA), adopting in its entirety the recommendation of an attorney examiner (examiner) to deny Winston's appeal from a decision of DPW's Office of Children, Youth and Families (OCYF) which revoked Winston's certificate of compliance to operate a group child day care home.

On November 19, 1992, DPW issued Winston a certificate of compliance to operate a group child day care home at 8041 Chaske Street, Verona, Pennsylvania. The certificate of compliance indicated that Winston's facility was to have a maximum capacity of twelve children. (Examiner's Finding of Fact, No. 3.)

On February 23, 1993, DPW received a complaint alleging that Winston's day care home was overpopulated. Consequently, two DPW representatives from OCYF visited Winston's facility on March 4, 1993 in order to conduct a complaint investigation.

Both Winston and her husband, Edward, ran day care facilities authorized to provide services to children funded by Coordinated Child Care Services (CCCS), an agency which provides eligible families with assistance in covering child care costs. (Examiner's Findings of Fact, Nos. 4–6.) At the time of OCYF's investigation of Winston's facility, twelve CCCS-funded children were identified as attending the Elaine Winston day care home and six CCCS-funded children were identified as attending the Edward Winston home; however, other children may have been attending these homes as well. (Examiner's Findings of Fact, Nos. 7–8.)

On March 4, 1993, when the OCYF representatives arrived at Elaine Winston's day care home, they observed nine pre-school children accompanied by one staff person in a classroom area on the basement level of the facility. (Examiner's Finding of Fact, No. 20.) Proceeding to the first level, the representatives observed thirteen more children, all infants and toddlers between the ages of 0 and 3 years, without any adult supervision. (Examiner's Finding of Fact, No. 21; R.R. at 359a.) The thirteen children on the first level were walking from room to room, crying and sleeping in playpens, highchairs and on the floor. (Examiner's Finding of Fact, No. 22.) In all, the OCYF representatives counted 22 children, ten more than the maximum capacity for Winston's home. (Examiner's Finding of Fact, No. 30.)

When the OCYF representatives asked why there were so many children in her facility, Winston explained that she was temporarily caring for several children from a day care home owned by her mother-in-law, Mary Louise Winston. Winston further explained that, while her husband took some of his children to the bus stop and then to school, she was caring for the other children from Mr. Winston's facility as well; Winston never indicated that her husband was involved in any type of medical situation. (Examiner's Findings of Fact, Nos. 24–26.) Moreover, no one arrived for any of the Edward Winston or Mary Louise Winston day care home children during the almost one and a half hours that the OCYF representatives were at the Winston facility. (Examiner's Finding of Fact, No. 27.)

During the course of their visit, the OCYF representatives also inquired into the names and records of the 22 children that they observed in the Winston facility.[1] (Examin-

er's Findings of Fact, Nos. 23, 28.) Upon examination of the childrens' records, the representatives discovered that the records did not contain the information required by Title 55, section 3280.182, of the Pennsylvania Code, 55 Pa.Code § 3280.182, if the records, in fact, existed at all.[2] (Examiner's Finding of Fact, No. 23.)

Based on the results of the investigation, OCYF concluded that Winston's facility was, in fact, overpopulated, as alleged in the complaint; at the time of the investigation, there were 22 children in Winston's care at the twelve-capacity facility. (R.R. at 1a.) Consequently, OCYF cited Winston for violation of regulations relating to the maximum capacity of a group child day care facility, as well as violation of numerous other regulations of Title 55 of the Pennsylvania Code. (See R.R. at 2a–3a.) OCYF found that Winston's noncompliance with various departmental regulations "create[d] significant risks to the health and safety of children in [Winston's] care and constitute[d] gross incompetence, negligence and misconduct in operating a facility." (R.R. at 3a.) Accordingly, OCYF revoked Winston's certificate of compliance by letter dated April 12, 1993. (R.R. at 1a–4a.)

On April 29, 1993, Winston appealed, and a hearing was held on January 11, 1994 before an examiner. At the hearing, the OCYF representatives testified concerning the foregoing results of their investigation. Based on their testimony, the examiner concluded that the overpopulation of the home, the lack of adequate adult supervision, and the absence and/or inadequacy of the childrens' records posed a substantial threat to the health and safety of the children.[3] (R.R. at 359a.)

---

1. Only three of the CCCS-funded children who attended the Edward Winston home, and none of the CCCS-funded children who attended the Mary Louise Winston home, were among the 22 children observed on March 4, 1993. (Examiner's Finding of Fact, No. 29.)

2. Parents' phone numbers, emergency phone numbers, physician phone numbers, health assessments and parental consent forms for medical care and the administration of medication were unavailable for many of the children. (R.R. at 360a.)

3. The examiner stated that:

It is clear that the condition of the facility and the lack of proper records could easily have affected the health of one or more of the children due to the lack of information needed to avoid risk or to properly handle a medical emergency. The risk to the safety and health of the 13 infants and toddlers who were left totally unsupervised is obvious and extreme. The combination of the other infractions, the missing and inadequate records, and lack of supervision result in a situation which was

Winston also testified at the hearing, explaining that the six children from her husband's facility were present on the day of the investigation because Mr. Winston had to attend to a medical emergency on that day.[4] (R.R. at 359a–60a.) However, the examiner concluded that Winston's testimony lacked credibility, inasmuch as her explanation for the overpopulation of the home at the time of the hearing was inconsistent with her earlier explanation at the time of the OCYF investigation.[5] (R.R. at 360a.) In fact, the examiner found that the six children who were allegedly at Winston's facility due to a medical emergency "were regularly receiving care there." (R.R. at 359a–60a.)

Based upon the foregoing findings, the examiner held that "[t]he threat to the health, safety and well being of the children, the lack of supervision, the missing and inadequate records, are all substantial violations of the regulations," demonstrating "gross incompetence in the operation of the program, and gross negligence in the care and supervision of the children." (R.R. at 361a.) Consequently, the examiner recommended that Winston's appeal be denied. (R.R. at 355a.)

On subsequent appeal, the Director of OHA issued an order, dated April 17, 1995, adopting the recommendation of the examiner in its entirety. Winston then appealed to this court.

## I.

■ On appeal,[6] Winston first argues that OCYF's revocation of her certificate of compliance should be declared null and void because DPW failed to comply with section 9003.11(F) of the DPW Manual, which provides that "[i]n no case shall the hearing be scheduled more than 90 days after the appeal has been taken." Section 9003.11(F) of the DPW Manual, 7 Pa.B. 3268 (1977). Here, Winston's hearing before the examiner was not held until January 11, 1994, nearly nine months after Winston appealed the revocation of her certificate of compliance. Winston contends that, because this nine-month delay resulting from DPW's failure to follow its own mandatory regulation prejudiced her,[7] DPW is without the power to revoke her license or impose penalties. DPW, on the other hand, contends that section 9003.11(F) of the DPW Manual is directory rather than mandatory and, therefore, cannot be the basis for sustaining an appeal. We agree with DPW.

This court has consistently held that provisions which impose time limitations on procedures before adjudicative tribunals are directory, rather than mandatory, even when phrased in mandatory language;[8] however,

really detrimental to the health, safety and well being of the children.
(R.R. at 360a.)

4. OCYF representatives made several visits to the Edward Winston day care home as well, including one on March 4, 1993, the same day that they visited Elaine Winston's facility. (Examiner's Finding of Fact, No. 16.) On that day, an OCYF representative waited at Edward Winston's facility for approximately fifteen minutes; the representative never saw Mr. Winston or any children and, in fact, was told that Mr. Winston was not there. (Examiner's Finding of Fact, No. 17.) However, the OCYF representative was never advised that Mr. Winston was attending to any type of medical situation. (Examiner's Finding of Fact, No. 18.)

5. The examiner found that, even if Winston was to be believed that six of the 22 children in the facility on the day of the inspection were present because of a medical emergency at her husband's day care home, there were still sixteen children at her facility, four more than that allowed by law.

6. Our scope of review in an appeal of an adjudication of DPW is limited to determining whether constitutional rights were violated, an error of law was committed or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Burroughs v. Department of Public Welfare*, 146 Pa.Cmwlth. 509, 606 A.2d 606 (1992).

7. Although she was permitted to continue operating her facility pending appeal, Winston claims that she lost funding in the amount of $700.00 to $800.00 per month from Community Human Services due to her lack of a valid license; however, Winston continued to feed the children at her facility through the time of DPW's final order.

8. *See, e.g., Pennsylvania State Police, Bureau of Liquor Control Enforcement v. JEK Enterprises, Inc.*, 153 Pa.Cmwlth. 411, 621 A.2d 1115 (1993); *Baker v. Department of Public Welfare*, 138 Pa. Cmwlth. 607, 588 A.2d 1337 (1991); *Pennsylvania Liquor Control Board v. Civic Arena Corp.*,

Winston distinguishes those decisions, reasoning that, in each case, the time constraints were imposed upon an adjudicative body which was independent of the administrative body initiating the proceeding. Winston contends that, because the adjudicative and administrative bodies here "are one and the same," the time limitations are mandatory. (Winston's brief at 11.)

However, Winston cites no authority within the applicable case law which establishes that the critical question in deciding the consequences of an agency's failure to meet a procedural time limitation is whether the prosecutorial and adjudicative bodies are "one and the same." [9] Nevertheless, assuming *arguendo* that Winston's contention is valid, we note that DPW's prosecutorial and investigative body, OCYF, and DPW's adjudicative body, OHA, are *not* one and the same here; rather, as DPW notes, they are two "separate and distinct subentities of the Department performing separate and distinct functions in connection with this appeal." [10] (DPW's brief at 7.)

In *J.L. v. Pennsylvania Department of Public Welfare*, 133 Pa.Cmwlth. 185, 575 A.2d 643 (1990), we construed a time limitation similar to the one set forth in section 9003.11(F).[11] In that case, we declined to strictly enforce the time limitation at issue so as to render DPW's decision on the merits of

the petitioner's request ineffective. Although DPW failed to take final administrative action within 90 days from the date of an appeal from an agency decision affecting social service, as required by regulation, we noted that there was no prejudice to the petitioner[12] and that there was no penalty for DPW's noncompliance with the 90-day time period contained in the regulations. Consequently, we concluded that the time periods set forth in the regulation were, "more likely than not, intended to be directory, as opposed to mandatory, in nature, despite the use of the word 'must'...." *Id.*, 575 A.2d at 646-47.

Although we were careful to limit *J.L.* to its particular factual circumstances, we believe that the factual circumstances presented here warrant a similar outcome. As in *J.L.*, we can discern no prejudice to Winston here which would warrant strict enforcement of the time limitation in section 9003.11(F) so as to render DPW's decision on the merits of Winston's request ineffective. Winston continued operating her facility throughout the pendency of her appeal, and the Director of OHA ultimately found that the allegations of gross incompetence and negligence made by the DPW investigators, and verified by the examiner, were substantiated by competent evidence. More significantly, there are no provisions in the DPW Manual which require

117 Pa.Cmwlth. 75, 543 A.2d 207 (1988), *appeal granted*, 521 Pa. 631, 558 A.2d 533 (1989), and *appeal withdrawn*, 533 Pa. 626, 620 A.2d 492 (1990); *West Penn Power Co. v. Pennsylvania Public Utility Commission*, 104 Pa.Cmwlth. 21, 521 A.2d 75 (1987).

9. It is true, however, that, if more than one function is reposed in a single administrative entity, walls of division must be constructed which eliminate the threat or appearance of bias. *Lyness v. State Board of Medicine*, 529 Pa. 535, 605 A.2d 1204 (1992). Thus, due process requires that the investigatory and prosecutorial aspects of the administrative process be adequately separated from the adjudicatory function. *Id.*

Here, because the separation between the prosecutorial and adjudicatory functions of DPW is adequate, absent any allegation of actual prejudice, to ensure that there is no threat or appearance of bias, Winston's due process rights are sufficiently protected.

10. The initial investigation was conducted, and the citation prepared, by OCYF, while the find-

ings of fact and the final determination or adjudication were made by OHA.

11. In *J.L.*, the time limitation at issue is contained in section 275.4(b)(1) of the Pennsylvania Code, 55 Pa.Code § 275.4(b)(1), which provides, in pertinent part, that:

(1) Final administrative action must be taken *in* hearings within the following time limits: ... 90 days from the date of an appeal from an agency decision affecting cash assistance, medical assistance, or social service.

12. We discerned no prejudice to the petitioner in *J.L.*, who sought to expunge a report of indicated child abuse, because, despite the hearing officer's delay in filing his recommendation, the report of indicated child abuse naming the petitioner as perpetrator was subsequently found to be substantiated pursuant to final administrative action taken by the Director of OHA within three days of the filing of the hearing officer's recommendations.

an appeal to be deemed granted on the basis of noncompliance; again, as in *J.L.*, no penalty attaches to DPW's noncompliance with the 90–day time period contained in section 9003.11(F).

Consequently, although we certainly do not condone the extended delay occasioned by DPW's laxity in scheduling a hearing on Winston's appeal, we will follow *J.L.* and decline to strictly enforce the time period specified in section 9003.11(F) of the DPW Manual. Dismissal of this particular case on procedural grounds, where our review establishes that Winston suffered no prejudice and that the finding of gross incompetence, negligence and misconduct is, in fact, supported by substantial evidence, as discussed below, "would visit an injustice upon the very party the [regulations] intended to protect." *J.L.* at 647. Such a result under the circumstances would, in our opinion, circumvent the primary objective of the regulations, namely, "to provide standards to aid in protecting the health, safety and rights of children and to reduce risks to children in group child day care homes." *See* Title 55, section 3280.2, of the Pennsylvania Code, 55 Pa.Code § 3280.2. Thus, to sacrifice the safeguards provided by these regulations solely on the basis of DPW's procedural error would serve only to penalize the children.

## II.

█ Winston also argues that the examiner's finding of gross incompetence, negligence and misconduct was not supported by substantial evidence, maintaining that a "temporary condition where the number of children briefly exceeded the permitted number due to emergency circumstances certainly does not rise to the level of gross incompetence, negligence or misconduct." (Winston's brief at 14.) Based on the extensive findings of fact and conclusions of law made by the examiner, we cannot agree.

Sections 1026(b)(1) and (4) of the Public Welfare Code (Code)[13] clearly state that DPW "*shall* refuse to issue a license or *shall* revoke a license for any of the following .reasons: (1) [v]iolation of or non-compliance with the provisions of this act or of regulations pursuant thereto; ... (4) [g]ross incompetence, negligence or misconduct in operating the facility...." 62 P.S. §§ 1026(b)(1) and (4) (emphasis added). Even if Winston's operation of the group child day care home does not rise to the level of gross incompetence, negligence or misconduct under section 1026(b)(4), as Winston claims, DPW was still entitled, if not obligated, to revoke Winston's license for numerous and egregious violations of the regulations promulgated under the Code pursuant to section 1026(b)(1) of the Code itself.

We believe, however, that Winston's conduct does, indeed, amount to "gross incompetence, negligence or misconduct." First, Winston's facility exceeded the maximum allowable capacity for a group child day care home by almost 50 percent. *See* 55 Pa.Code § 3280.51. Although Winston explained that the facility only exceeded the maximum capacity on that day because of an emergency, the examiner rejected Winston's testimony as lacking credibility. Because the Director of OHA adopted the examiner's recommendation in its entirety, and the Director is the ultimate factfinder in a case such as this, we will not disturb the Director's credibility determination on appeal. *Northwestern Institute of Psychiatry v. Department of Public Welfare*, 99 Pa.Cmwlth. 213, 513 A.2d 495 (1986).

Second, and more disturbing, is the examiner's finding, adopted by the Director of OHA, that thirteen infants and toddlers, some not old enough to sit up, were left alone on the first floor of Winston's facility with no adult supervision whatsoever. Regulation requires at least three staff persons supervising a group of twelve infants and toddlers at all times, *see* 55 Pa.Code § 3280.52; therefore, Winston's supervisory staff was woefully inadequate for such a large group of children.

The foregoing evidence of overpopulation and understaffing, in combination with evidence of incomplete medical records and numerous other health and safety violations, is undoubtedly substantial to support a conclusion that conditions at Winston's facility

---

**13.** Act of June 13, 1967, P.L. 31, *as amended,* 62 P.S. §§ 101–1411.

posed a threat to the health and safety of the children in her care and that Winston's operation of her facility was grossly incompetent and negligent.

Accordingly, we affirm the order of the Director of OHA denying Winston's appeal.

### ORDER

AND NOW, this 22nd day of April, 1996, the order of the Director of the Pennsylvania Department of Public Welfare, Office of Hearings and Appeals, dated April 17, 1995, is affirmed.