# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Ardelia Terry, and Ardelia Terry | : | |
| Family Child Care Home, | : | |
| Petitioners | : | |
| | : | |
| v. | : | No. 568 C.D. 2020 |
| | : | Submitted: February 6, 2024 |
| Department of Human Services, | : | |
| Respondent | : | |


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, President Judge
            HONORABLE ANNE E. COVEY, Judge
            HONORABLE MARY HANNAH LEAVITT, Senior Judge


<u>**OPINION NOT REPORTED**</u>


**MEMORANDUM OPINION BY**
**PRESIDENT JUDGE COHN JUBELIRER**          **FILED: March 6, 2024**

Ardelia Terry (Terry), owner and operator of Ardelia Terry Family Child Care Home (Child Care Home), petitions for review of an Order of the Department of Human Services (DHS), Bureau of Hearings and Appeals (BHA), which adopted the recommendation of an Administrative Law Judge (ALJ) that denied Terry's appeals of DHS's decisions to emergently remove children from the Child Care Home and to revoke Terry's regular certificate of compliance (license) to operate the Child Care Home. Terry argues DHS erred in ordering an emergency removal of the children and revoking her license. After review, we affirm.

## I. BACKGROUND

The Child Care Home has been in operation since November 1, 1998, out of Terry's personal residence in Pittsburgh. (ALJ Adjudication (Adjudication), Findings of Fact (FOF) ¶¶ 1-3.) Terry is licensed to care for a maximum of six children at a time and is the sole staff person. (*Id.* ¶¶ 4-5.) On May 20, 2019, Terry was caring for two one-year olds, one two-year old, and one three-year old, all of whom were in diapers. (*Id.* ¶¶ 6-7.) At 10:45 a.m., Terry left the Child Care Home while the children were napping to drive to Target, which is 10 minutes away, to "g[e]t something – it was, to [her] they looked like peas, but [her] son's girlfriend called them something else. They're green and [the girlfriend] is from California and she said she liked them[,] so [Terry] went there to get them." (*Id.* ¶¶ 10-11, 14-15.) Terry admitted this shopping trip was not an emergency and does not dispute the four children were left unsupervised. (*Id.* ¶¶ 12, 16.) At the time, Terry's adult son and his girlfriend, who are not employees of the Child Care Home, were upstairs, but Terry did not ask anyone to watch the children. (*Id.* ¶¶ 8, 11, 46; Adjudication at 18.)

When Terry returned to the Child Care Home 30-35 minutes later, the three-year old was on the front porch of the Child Care Home speaking with a woman who was standing outside of the front gate along with two other women, none of whom Terry knew. (FOF ¶¶ 17, 19-20, 45.) One of the women told Terry that she found the three-year-old child three to four blocks from the Child Care Home, of which Terry was skeptical. (*Id.* ¶¶ 21-22.) One of the women demanded Terry call the parents, and the woman spoke with the father. (*Id.* ¶¶ 23-24.) He expressed gratitude that nothing had happened to the child and the woman responded, "what the F do you mean" and returned the phone to Terry. (*Id.* ¶ 25.) Terry took the three-year

old back into the Child Care Home and attempted to talk with the women, but one of the women was "screaming[,]" so Terry returned inside. (*Id*. ¶¶ 26-27.) The other three children were inside the Child Care Home. (*Id*. ¶ 26.)

About 20 minutes later, Pittsburgh police arrived on a report that a child was wandering.[1] (*Id*. ¶ 28.) Terry called DHS that same day and reported this incident. (*Id*. ¶ 32.) On May 24, 2019, Kristen Court, a certification representative for the Office of Child Development and Early Learning (Certification Representative), conducted an unannounced inspection of the Child Care Home because DHS received a complaint on or around May 22, 2019, that a three-year-old child was found wandering the streets. (*Id*. ¶¶ 31, 33-35.) Certification Representative interviewed Terry, who told Certification Representative that on May 20, 2019, "she put the four children present at the [Child Care Home] down to nap around 10:45 a.m. and left the facility" to go to Target for "30 or 35 minutes." (*Id*. ¶¶ 39-41, 45.) Terry told Certification Representative that her son was upstairs sleeping at the time in question, and she did not alert him that she was leaving the Child Care Home. (*Id*. ¶¶ 46, 48.) Terry also told Certification Representative that when she returned to the Child Care Home, the three-year-old child was standing on the front porch and there were three unknown women yelling at Terry. (*Id*. ¶ 49.)

Certification Representative prepared an inspection summary, summarized how and why Terry left the children unsupervised, and cited Terry for regulatory violations she observed during her investigation. (*Id*. ¶¶ 51-52.) In addition to leaving the children unsupervised, DHS determined the following conditions existed during the May 24, 2019 inspection:

---

[1] Terry was criminally charged with four counts of felony grade child endangerment and one summary offense. (FOF ¶ 67.) Due to uncooperative witnesses, the felony charges were dismissed, and Terry pled guilty to one summary offense of disorderly conduct. (*Id*. ¶ 68.)

(2) The following hazards were observed accessible to the children in care on the front porch:

    i. A charcoal grill with a broken handle[;]

    ii. A deep fryer with oil inside with a lid that was easily removed[;]

    iii. Stacked milk crates that were a potential tipping hazard[;]

    iv. A big black plastic garbage bag[;]

    v. Other items of clutter.

The following other items were observed on the side of the home and accessible to children:

    i. A wood bow rake[;]

    ii. Metal bed posts[;]

    iii. Metal street sign[;]

    iv. A weedwacker[;]

    v. Two vehicle tires[;]

    vi. Three stacked window air conditioner units[;]

    vii. Five empty gasoline cans[;]

    viii. Other items of clutter.

(*Id.* ¶ 53; Reproduced Record (R.R.) at 22.[2]) Certification Representative took photos of these conditions. (FOF ¶ 54; Ex. C-2.) Terry did not dispute that the photos Certification Representative took that day accurately depicted the conditions outside the Child Care Home on the day the three-year old escaped, agreed that children must pass through the front porch to enter the Child Care Home each day, and agreed there was no fence to block the children from having access to the sides of the Child Care Home. (FOF ¶¶ 70-72.) Certification Representative informed Terry of her findings, and Terry provided Certification Representative with a written statement detailing how and why she left the Child Care Home on May 20, 2019.

---

[2] The pagination of the Reproduced Record does not comport with Pennsylvania Rule of Appellate Procedure 2173, Pa.R.A.P. 2173 (requiring pagination to be in the form of an Arabic number followed by a small "a"). We will utilize the pagination used by the Reproduced Record for ease of reference.

(*Id.* ¶¶ 55-56; Ex. C-3.) Certification Representative summarized multiple violations of DHS regulations in a May 24, 2019 inspection summary.

On May 28, 2019, Certification Representative returned to the Child Care Home and handed Terry a Notice of Emergency Removal and conducted an emergency removal of the children from the Child Care Home, which Terry appealed. (FOF ¶¶ 59, 62; Emergency Removal Order, R.R. at 20-21.) On June 27, 2019, DHS mailed Terry a letter informing her that DHS was revoking her license to operate a childcare center, which Terry also appealed. (*Id.* ¶¶ 63, 66; Revocation Letter, R.R. at 12.) DHS "determined the emergency removal and licensing action[s] were necessary because . . . the conditions constituted gross incompetence, negligence[,] and misconduct in operating the [Child Care Home], and because . . . the [Child Care Home] failed to comply with the Human Services Code[3] and [DHS] Regulations." (*Id.* ¶ 65.)

A joint administrative hearing was held before the ALJ on January 21, 2020. DHS presented Certification Representative as its sole witness, and Terry also testified. The ALJ found them both credible. (*Id.* ¶¶ 73-74.) The ALJ then issued a Recommendation with an opinion explaining that DHS's decisions to emergently remove the children from the Child Care Home and to revoke Terry's license "were both based on essentially the same issues: [] [Terry] failed to comply with regulations, and [] [Terry] engaged in gross incompetence, negligence, or misconduct in operating the facility." (Adjudication at 17.)

The ALJ first discussed Terry's regulatory violations. She concluded DHS properly cited Terry for a violation of 55 Pa. Code § 3290.18, relating to general health and safety, because "[t]he underlying facts that caused [DHS] to cite a

---

[3] Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. §§ 101-1503.

regulatory violation are not in dispute. . . . Terry, the sole care provider . . . left four children ages three and younger at the [Child Care Home] and drove to the store to buy something for her son's girlfriend." (*Id*. at 18.) The ALJ further concluded DHS properly cited Terry for a violation of 55 Pa. Code § 3290.113(a), relating to supervision, because "[t]he children at the [Child Care Home] were unfortunately supervised by no one when [] Terry left them. [] Terry was not physically present for around 30 minutes by her own testimony." (*Id*.) Next, the ALJ concluded Terry violated 55 Pa. Code § 3290.64, relating to toxics, and 55 Pa. Code § 3290.74(a), relating to building surfaces. She explained that in relation to the violation for toxics, "the child who escaped the facility was on the porch . . . in close proximity to two bottles of windshield washer fluid and a container of cleaning wipes." (*Id*. at 19.) The ALJ further explained that in relation to building surfaces, the porch, and the sides of the Child Care Home had items of clutter, such as a deep fryer, gas cans, and stacked metal posts and signs. (*Id*.) In addition, the ALJ found the children have to pass through the porch to get inside the Child Care Home, there is no barrier blocking access to the side of the house, and the child who escaped was found on the porch, so DHS properly cited Terry for the building surfaces violation. (*Id*.)

The ALJ then discussed whether Terry acted in a grossly incompetent or negligent manner or acted with willful misconduct. The ALJ reasoned that because "Terry left four small children alone[, this] absolutely demonstrates gross incompetence, negligence[,] and misconduct. . . . [T]his is obviously a flagrant gross deviation from the ordinary standard of care." (*Id*.) In sum, the ALJ concluded DHS "did not abuse its discretion in taking action to emergently remove the children in [Terry's] care and did not abuse its discretion in revoking [Terry]'s license[.]" (*Id*.

at 20.) By Order dated May 19, 2020, the BHA adopted the ALJ's recommendation in full. (BHA Order.) Terry timely petitioned this Court for review.

## II. PARTIES' ARGUMENTS

On appeal,[4] Terry argues DHS "erred in removing [the] children [from the Child Care Home] and [in] revoking [Terry's] license." (Terry's Brief (Br.) at 24.) Terry explains her son and his girlfriend were in the home and were in the "line of hearing when T[erry] left." (*Id*. at 27.) Terry next argues DHS did not present any of the three women who found the three-year-old child as witnesses at the hearing, so "[i]t must be presumed that those witnesses would not have been helpful to [DHS's] position." (*Id*. at 27.) In addition, she argues there was no "competent" evidence that the three-year-old child was wandering the streets. (*Id*.) Further, Terry argues Certification Representative did not interview the parents of the three-year-old child who escaped, and they are the parties "most interested in the gravity of the incident." (*Id*. at 28.) Terry explains the written statement she provided to Certification Representative was only a summary of what the three women standing outside accused her of, so as to not withhold any information from DHS. (*Id*.) Terry also mentions that because her felony charges were dismissed, she pled guilty to one summary offense of disorderly conduct, and there were " missing witnesses[,]" "the alleged gravity of the situation . . . cannot be sustained." (*Id*. at 29.) Terry lastly argues Certification Representative did not "identify any unsecured toxics, sharp,

---

[4] Our standard of review is "limited to determining whether an error of law was committed, whether constitutional rights were violated," and "whether necessary findings of fact are supported by substantial evidence." *Altagracia De Pena Family Day Care v. Dep't of Pub. Welfare*, 943 A.2d 353, 356 n.3 (Pa. Cmwlth. 2007).

pointed, cutting objects or toppling objects at all[,]" and the porch and sides of the Child Care Home are not care areas. (*Id.* at 29-30.)

DHS responds that it properly conducted an emergency removal of the children from the Child Care Home and revoked Terry's license because she acted with gross incompetence, negligence, and willful misconduct. (DHS's Br. at 6, 9-10.) DHS argues the ALJ had sufficient evidence to conclude Terry violated DHS regulations by leaving the four young children unsupervised with no other staff person and having hazardous items on her porch where the three-year-old child was found and the side of the Child Care Home with no barrier preventing the children from reaching these items. (*Id.* at 6-9.)

## III. DISCUSSION

### A. Emergency Removal

DHS conducted an emergency removal of the children from the Child Care Home because it concluded Terry's actions demonstrated gross incompetence, negligence, and misconduct. DHS's regulations provide that DHS may conduct an emergency removal of children from a daycare facility "[i]f [DHS] finds evidence of gross incompetence, negligence, misconduct in operating the facility . . . likely to constitute an immediate and serious danger to the life or health of the [children.]" 55 Pa. Code § 20.37.

This Court addressed an emergency removal order in *Colonial Manor Personal Care Boarding Home v. Department of Public Welfare*, 551 A.2d 347 (Pa. Cmwlth. 1988). In *Colonial Manor*, a boarding home's patients were emergently removed because the home could not meet the personal care needs of the patients who were previously held in a nursing home that lost funding to care for the patients.

8

*Id.* at 348-51. The Court concluded there was sufficient evidence of an emergency because there were numerous observations of patients in need of critical care that they were not receiving. *Id*. at 351. The Court also addressed an emergency removal order in *Liberty Manor Personal Care Home v. Department of Public Welfare* (Pa. Cmwlth., No. 979 C.D. 2014, filed April 17, 2015).[5] In *Liberty*, the Department of Public Welfare (DPW)[6] emergently removed clients from the care home because it became aware that the three individuals who made up the management structure were likely going to be arrested. *Id.*, slip op. at 17, 19. This Court concluded there was evidence of an emergency because if these three individuals were going to be removed from the facility, there would be no one in a management position to care for the clients, and a personal care home must always have a qualified administrator. *Id*. at 17-18.

Concerning what behavior constitutes gross incompetence, negligence, and misconduct, *Gibbs v. Department of Public Welfare*, 947 A.2d 233 (Pa. Cmwlth. 2008), is instructive.[7] In *Gibbs*, the owner operated a daycare out of her personal residence. One day, she ordered her son, who worked for the daycare, to watch the children outside while she spoke to a parent inside the home. A child left the yard and crossed the street to a neighbor's house. *Gibbs*, 947 A.2d at 234. This Court did not find sufficient evidence of gross incompetence, negligence, or misconduct

---

[5] Pursuant to Pennsylvania Rule of Appellate Procedure 126(b), Pa.R.A.P. 126(b), and Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a), an unreported opinion of this Court, while not binding, may be cited for its persuasive value.

[6] DPW subsequently changed its name to DHS. Section 103 of the Human Services Code, added by Section 2 of the Act of September 24, 2014, P.L. 2458, 62 P.S. § 103 (effective November 24, 2014).

[7] Our Supreme Court defines gross negligence in other contexts as "conduct substantially more than ordinary carelessness, inadvertence, laxity, or indifference; that is, behavior that is flagrant, grossly deviating from the ordinary standard of care." *Albright v. Abington Mem'l Hosp.*, 696 A.2d 1159, 1167 (Pa. 1997).

because DPW did not show that trusting the son to watch the children was grossly incompetent, negligent, or misconduct. *Id*. at 237. The Court explained:

> [DPW] argues that Gibbs left the child without supervision, but **this is not the case**. Gibbs did not simply walk away from the children, leaving them to fend for themselves. She left the children under the supervision of an adult **employee** of the day care when she went in the house to speak privately with one of the parents. . . . We hold that Gibbs complied with the regulations by entrusting the children to the **supervision of an adult employee**.

*Id*. (first emphasis in original); *Cf. Winston v. Dep't of Pub. Welfare*, 675 A.2d 372, 377 (Pa. Cmwlth. 1996) (affirming DPW's finding of substantial evidence of gross incompetence, negligence, and misconduct because the daycare exceeded its maximum capacity of children, and 13 infants and toddlers were found in the daycare without any supervision).

Terry **indisputably** left the Child Care Home with four young children still in diapers without any other employee present, did not inform anyone that she was leaving, and was away for at least 30 minutes for a non-emergent reason. (FOF ¶¶ 10-12, 14-16, 39-41, 45-46, 48-49.) Terry was the **sole caretaker** of these children as she does not have any other employees. *Liberty*, slip op. at 17-18; *Gibbs*, 947 A.2d at 237. Unlike the case of *Gibbs*, Terry's actions did leave the children "to fend for themselves" because Terry did not leave the children "under the supervision of an adult employee" when she left the Child Care Home. 947 A.2d at 237. Terry's argument that she did not leave the children unsupervised because her son and his girlfriend were upstairs is not persuasive, as Terry did not inform anyone that she would be leaving the Child Care Home. Even if the son and girlfriend were "in [the] line of hearing[,]" as Terry contends, (Terry's Br. at 27), the three-year-old child still woke up from their nap and left the Child Care Home unnoticed. Further, neither

10

the son nor the girlfriend were employees of the Child Care Home. *Gibbs*, 947 A.2d at 237. Terry's actions are more akin to the case of *Winston*, where young children were found in a daycare facility without any supervision at all. 675 A.2d at 377. We conclude Terry's actions of leaving four young children by themselves for 30-35 minutes to run a non-emergent errand when Terry is the owner and only employee of the Child Care Home constitutes gross incompetence, negligence, and misconduct. Therefore, DHS properly conducted an emergency removal of the children.

### B.    License Revocation

Section 1026(b)(1) and (4) of the Human Services Code provides: "[DHS] shall . . . revoke a license for any of the following reasons: . . . (1) [v]iolation of or non-compliance with the provisions of this act or of regulations pursuant thereto; . . . [or] (4) [g]ross incompetence, negligence[,] or misconduct in operating the facility[.]" 62 P.S. § 1026(b)(1), (4). DHS's regulations further provide DHS "may deny, refuse to renew[,] or revoke a certificate of compliance for any of the following: (1) [f]ailure to comply with this chapter[;] (2) [n]oncompliance with [DHS]'s program licensure or approval regulations[;] . . . [or] (6) [g]ross incompetence, negligence[,] or misconduct in operating the facility or agency." 55 Pa. Code § 20.71(1)-(2), (6). It is on these bases that DHS revoked Terry's license.

Our analysis above explains DHS properly found that by leaving the children unsupervised, Terry acted with gross incompetence, negligence, and willful misconduct. *See Colonial Manor*, 551 A.2d at 351; *Liberty*, slip op. at 17-18; *Winston*, 675 A.2d at 377; *Gibbs*, 947 A.2d at 237. Therefore, DHS did not err in revoking Terry's license on this basis.

11

DHS also revoked Terry's license because it found Terry violated DHS regulations, including Section 3290.18, relating to general health and safety, and Section 3290.113(a), relating to supervision. Section 3290.18 provides that "[c]onditions at the facility may not pose a threat to the health or safety of the children." 55 Pa. Code §3290.18. Section 3290.113(a) provides that "[c]hildren on the facility premises and on facility excursions off the premises shall be supervised by **a staff person at all times**." 55 Pa. Code § 3290.113(a) (emphasis added). DHS regulations define "supervise" as "[being] **present** in the child care facility with the children or with the facility person under supervision. Supervision is critical oversight in which the supervisor can **see, hear, direct and assess the activity** of the supervisee." 55 Pa. Code § 3290.4 (emphasis added).

Clearly, Terry was not supervising the children when she left the Child Care Home. Neither Terry, the son, nor the son's girlfriend could "see, hear, direct and assess the activity of the [children]" as Terry was not present, and the son and girlfriend were upstairs. 55 Pa. Code § 3290.4. Again, although the son and girlfriend were in the home, the three-year-old child was still able to wake up from their nap and leave the home. Besides, neither the son nor the girlfriend were "staff person[s]" as the regulations require. 55 Pa. Code § 3290.113(a). The lack of supervision also "pose[d] a threat to the health or safety of the children" because in the case of an emergency or accident, the children, who were still in diapers, would be left without any help. 55 Pa. Code § 3290.18. We conclude DHS properly revoked Terry's license for violating DHS regulations relating to general health and safety and supervision by leaving the children without supervision at the Child Care Home for a non-emergent reason.

12

Not only did Terry leave the children without supervision, but DHS cited other violations of DHS regulations including Section 3290.64(a), relating to toxics, and Section 3290.74(a), relating to building surfaces. Section 3290.64(a) provides that "[c]leaning materials and other toxic materials shall be stored in an original labeled container or in a container that specifies the content . . . [and] kept in a locked area or in an area inaccessible to children[.]" 55 Pa. Code § 3290.64(a). Section 3290.74(a) provides that "[f]loors, walls, ceilings and other surfaces, including the facility's outdoor play area, shall be kept clean, in good repair and free from visible hazards." 55 Pa. Code § 3290.74(a).

Contrary to Terry's argument that Certification Representative did not find any items that were toxic, sharp, pointed, or able to topple, (Terry's Br. at 29), Certification Representative took photos displaying multiple items on the porch and sides of the Child Care Home, including two bottles of windshield washer fluid, a container of cleaning wipes, a charcoal grill with a broken handle, a deep fryer with oil inside, window air conditioning units, empty gasoline cans, and other items of clutter. (FOF ¶ 54; Ex. C-2.) Terry did not dispute that these photos represented the conditions of the Child Care Home the day she left the children. (FOF ¶ 70.) The hazardous items on the porch constitute a violation of DHS regulations considering the three-year-old child was found on the porch with access to these items. Regarding the items on the side of the home, although there was no finding that the children actually access this area, the ALJ did find that there is no blockage preventing children from accessing them. (*Id*. ¶ 72). The items on the porch are violations of DHS regulations relating to toxics and building surfaces and support DHS's decision to revoke Terry's license.

13

## IV. CONCLUSION

In sum, we find DHS properly conducted an emergency removal of the children from the Child Care Home and revoked Terry's license because Terry demonstrated gross incompetence, negligence, and misconduct by indisputably leaving the children without any supervision for a non-emergent reason. In addition, DHS also properly found that Terry violated DHS regulations. Accordingly, we affirm.[8]

_____

**RENÉE COHN JUBELIRER,** President Judge

---

[8] Due to our disposition, we need not address Terry's remaining arguments.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ardelia Terry, and Ardelia Terry : 
Family Child Care Home, : 
                Petitioners : 
                 : 
            v. :   No. 568 C.D. 2020
                 : 
Department of Human Services, : 
              Respondent : 

## O R D E R

**NOW**, March 6, 2024, the Order of the Department of Human Services, Bureau of Hearings and Appeals, entered in the above-captioned matter, is **AFFIRMED**.

 

_____
**RENÉE COHN JUBELIRER,** President Judge